WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| State 48 Recycling Incorporated,<br><br>    Plaintiff,<br><br>v.<br><br>Michael Ray Janes, et al.,<br><br>    Defendants. | No. CV-22-00767-PHX-GMS<br><br>**ORDER** |

Before the Court is State 48 Recycling, Inc.'s ("Plaintiff") Application for and Memorandum in Support of Temporary Restraining Order and Preliminary Injunction (Doc. 17-1 at 86.) For the following reasons, the application is granted in part, and a temporary restraining order ("TRO") is issued.

## BACKGROUND

Plaintiff is an Arizona corporation that "specializ[es] in the re-manufacture of used engine antifreeze/coolant and recycling of safety solvents." (Doc. 17-1 at 9.) It offers a "wide range of products and services" to its customers, who are mainly in the automotive industry. (Doc. 17-1 at 9.) In April 2021, Plaintiff purchased the assets of Industrial Recycling Solutions Inc. ("IRSI"), an Arizona corporation in the same industry. As part of the purchase, Plaintiff acquired ownership of IRSI's trade names, trademarks, and logos, and acquired the right to use the name "IRSI" as a "doing business as" designation.

After Plaintiff acquired IRSI's assets, Plaintiff gradually transitioned its business

from "IRSI" to "State 48 Recycling." The transition was deliberately slow. Plaintiff hired former IRSI employees and continued to use the IRSI logo, uniforms, and company trucks until September 2021. That month, Plaintiff began using new gray uniforms with the "State 48 Recycling" logo but continued to use the IRSI mark on its company trucks and on its website. Moreover, even though Plaintiff used the new uniforms, employees could wear the old IRSI uniforms if, for some reason, the new ones were unavailable: for instance, if the new uniforms were taken to be cleaned.

Michael Janes and Angel Alva ("the Individual Defendants") were employed by IRSI for years before beginning employment with Plaintiff.[1] The Individual Defendants continued to work for Plaintiff through March 2022. While they were still employed by Plaintiff, the Individual Defendants formed Defendant Antifreeze Architects, LLC. Defendant Antifreeze Architects is a direct competitor of Plaintiff.

Since the Individual Defendants left Plaintiff's employment, they are alleged to have continued to service Plaintiff's customers. According to Plaintiff, the Individual Defendants arrive a week before Plaintiff is scheduled to provide service and charge customers less than Plaintiff's rates. The Individual Defendants wear the old IRSI uniforms, which Plaintiff's customers associate with Plaintiff, even though the Individual Defendants are no longer employed by Plaintiff. Although the Individual Defendants do not contest that they directly solicit Plaintiff's customers, they do contest that they do so while wearing the IRSI mark and by holding themselves out as Plaintiff's employees.

Plaintiff filed suit in Maricopa County Superior Court on April 21, 2022, alleging fourteen causes of action. While the case was pending in state court, Plaintiff filed an application for a TRO. Defendants then removed the case to this Court pursuant to its federal-question jurisdiction over Plaintiff's Lanham Act claim. The Court held an evidentiary hearing on May 12, 2022 and now decides the pending application.[2]

---

[1] IRSI had employed Defendant Janes for five years and Defendant Alva for two. (Doc. 17-1 at 11.)

[2] All facts have been taken from the testimony at the evidentiary hearing, unless otherwise specified.

**DISCUSSION**

**I.    Legal Standard**

Rule 65 authorizes courts to issue temporary restraining orders and preliminary injunctions, and the legal standards for issuing both kinds of orders are the same. *See* Fed. R. Civ. P. 65; *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001); *Ariz. Recovery Hous. Ass'n v. Ariz. Dep't of Health Scis.*, 462 F. Supp. 3d 990, 996 (D. Ariz. 2020). However, the two forms of relief serve different purposes: "The purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered, while the purpose of a [TRO] is to preserve the status quo before a preliminary injunction hearing may be held." *Ariz. Recovery Hous.*, 462 F. Supp. 3d at 996 (quoting *Johnson v. Macy*, No. CV 15-7165 FMO (ASx), 2015 WL 9692930, at *3 (C.D. Cal. Oct. 23, 2015)).

Preliminary relief "is an extraordinary remedy never awarded as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To prevail, the moving party bears the burden of showing that they are (1) "likely to succeed on the merits," (2) "likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [their] favor," and (4) "that an injunction is in the public interest." *Id.* at 20. If the moving party fails to demonstrate a likelihood of success on the merits but nevertheless shows "serious questions going to the merits were raised and the balance of hardships tips sharply in [their] favor," courts in the Ninth Circuit may issue preliminary relief provided "the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

**II.   Consideration of Evidence**

Defendants object to several pieces of evidence. The Federal Rules of Evidence, however, "do not apply strictly to preliminary injunction proceedings." *Trees v. Serv. Employees Int'l Union Local 503*, --- F.Supp.3d ----, 2021 WL 5206137, at *2 (D. Or. Nov. 9, 2021) (quoting *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013)); *Disney Enter., Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 996 (C.D.

Cal. 2016). The Court will thus fully consider Defendants' objections as it assesses the credibility of evidence. But the Court will not decline to consider a piece of evidence merely because it violates the technical requirements of the Federal Rules of Evidence, if the evidence is otherwise credible.

**III.   Analysis**

    **A.   Likelihood of Success on the Merits**

Plaintiff argues they are likely to succeed on the merits of four of their claims: breach of the duty of loyalty, misappropriation of trade secrets, trademark infringement and counterfeiting, and defamation per se. (Doc. 17-1 at 96–102.) The Court considers each in turn.

        **1.   Duty of Loyalty**

An employee owes their employer a fiduciary duty of good faith and loyalty. *McCallister Co. v. Kastella*, 170 Ariz. 455, 457, 825 P.2d 980, 983 (Ct. App. 1992); *Sec. Title Agency, Inc. v. Pope*, 219 Ariz. 480, 492, 200 P.3d 977, 989 (Ct. App. 2008); *E*Trade Fin. Corp. v. Eaton*, 305 F. Supp. 3d 1029, 1032 (D. Ariz. 2018). Prior to termination of the employment relationship, the employee may not directly compete with the employer, but is permitted to make "not otherwise wrongful" arrangements to compete. *Taser Int'l, Inc. v. Ward*, 224 Ariz. 389, 394, 231 P.3d 921, 926 (Ct. App. 2010) (quoting Restatement (Third) of Agency § 8.04 (Am. L. Inst. 2006)).

Plaintiff alleges that the Individual Defendants violated their duty of loyalty by (1) forming Defendant Antifreeze Architects while still employed by Plaintiff, (2) taking Plaintiff's supplies and uniforms, (3) taking Plaintiff's confidential and proprietary "pricing lists, customer lists, and customer routes" for the benefit of Defendant Antifreeze Architects, and (4) using the misappropriated inventory and information to directly compete with Plaintiff. (Doc. 17-1 at 97.)

Plaintiff has failed to show that the Individual Defendants breached their duty of loyalty. First, incorporation alone is insufficient to show direct competition. *McCallister Co.*, 170 Ariz. at 457–58, 825 P.2d at 982–83 (Ct. App. 1992) (noting that it is generally

permissible for an employee to prepare to compete by "purchas[ing] a rival business" (quoting Restatement (Second) of Agency § 393 cmt. e (Am. L. Inst. 1958))); *Powers Steel & Wire Prods., Inc. v. Vinton Steel, LLC*, No. 1 CA-CV 20-0652, 2021 WL 5495289, at *6 (Ariz. Ct. App. Nov. 23, 2021) ("An agent who plans to compete is free to make extramural arrangements for setting up a new business, *such as incorporating a new firm . . . .*" (emphasis added) (quoting Restatement (Third) of Agency § 8.04 cmt c)). Second, Plaintiff has produced no evidence, save for the bare allegations in Mr. Brian Rich's declaration,[3] to show that the Individual Defendants took Plaintiff's property or customer information during their employment. (Doc. 12 at 6.) Mr. Rich admitted that there was no written record of either Individual Defendant ever having printed or otherwise communicated customer information to themselves or others. Even so, the mere access to client files does not sufficiently show that the Individual Defendants actively solicited customers before their employment ended. *E*Trade*, 305 F. Supp. 3d at 1032 ("At the time [the defendant] accessed the [plaintiff's] client files, he had authorization to do so, he was tasked with serving those clients as an employee of [plaintiff], and even if he did so to access the clients' contact information, without more at that point the Court cannot conclude he likely breached his duty of loyalty.") And, as conceded by Plaintiff, the Individual Defendants occasionally used their IRSI uniforms during their employment with Plaintiff. Plaintiff has presented no evidence it was improper for the Individual Defendants to do so, nor has it established that the Individual Defendants used those uniforms to solicit customers during their employment or that the Individual Defendants were required to return those uniforms when they resigned. At this juncture, Plaintiff has not established it is likely to succeed on the duty of loyalty claim.

### 2. Misappropriation of Trade Secrets

"To establish a claim for misappropriation of a trade secret, the claimant must first prove a legally protectable trade secret exists." *Calisi v. Unified Fin. Servs., LLC*, 232 Ariz. 103, 106, 302 P.3d 628, 631 (Ct. App. 2013). "Arizona has adopted the Uniform

---

[3] Mr. Rich is Plaintiff's co-owner.

Trade Secrets Act ('UTSA'), which codifies the basic principles of common law trade secret protection." *Id.* The UTSA defines a trade secret as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique or process, that both:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy

Ariz. Rev. Stat. § 44-401(4). "Because the hallmark of a trade secret is secrecy," *Calisi*, 232 Ariz. at 106, 302 P.3d at 631, "matters that are public knowledge are not safeguarded as trade secrets." *Enter. Leasing Co. of Phx. v. Ehmke*, 197 Ariz. 144, 149, 3 P.3d 1064, 1069 (Ct. App. 1999). The subject matter of trade secrets "must be sufficiently novel, unique, or original that it is not readily ascertainable to competitors." *Calisi*, 232 Ariz. at 106, 302 P.3d at 631. "[A] trade secret may include a grouping in which the components are in the public domain but there has been accomplished an effective, successful and valuable integration of those public elements such that the owner derives a competitive advantage from it." *Ehmke*, 197 Ariz. at 149, 3 P.3d at 1069.

According to the complaint and Mr. Rich's declaration, Plaintiff acquired IRSI's customer lists and routes and pricing lists as part of the asset purchase in 2021. (Doc. 17-1 at 43–44.) The Court certainly recognizes that knowledge of customer preferences—such as how they prefer to pay or when they require service—could derive independent economic value from its secrecy. Plaintiff has failed to establish, however, that it made reasonable efforts to maintain such secrecy. Plaintiff makes the bare allegations that its customer and pricing information is "proprietary," "not public knowledge," that it limited access to this information, and that it prohibited the removal of the information from "Company premises." (Doc. 17-1 at 44.) But Plaintiff has failed to show what specific steps it took to keep this information confidential: for example, how it enforced its policies about limiting employee access and keeping the information confidential. Although

Plaintiff asserts that the information was restricted to "management and the owners," it is uncontested that Plaintiff gave its drivers, including the Individual Defendants, invoices with the customers' names, contact information, how often they received service, and how they preferred to pay. Plaintiff does not provide the Court with any evidence that it instructed the drivers that this information was proprietary or that it took any steps to protect it. Nor did Plaintiff require its employees to sign any confidentiality or non-competition agreement. Given that Plaintiff currently employs only five employees, and only employed as many as eight before the Individual Defendants resigned, the Court is not persuaded that disclosing allegedly proprietary information to a significant portion of its workforce—without instruction to keep it confidential—constitutes "efforts that are reasonable under the circumstances to maintain its secrecy."[4] Ariz. Rev. Stat. § 44-401(4)(b). Plaintiff's request for a temporary restraining order is denied as to this claim.

### 3. Trademark Infringement and Counterfeiting

Plaintiff pleads claims for trademark infringement under both the Lanham Act and Arizona law. *See* 15 U.S.C. § 1114; Ariz. Rev. Stat. §§ 44-1441 to -1456. State statutory trademark claims are substantially congruent to claims made under the Lanham Act. *See Health Indus. Bus. Commc'ns Council Inc. v. Animal Health Inst.*, 481 F. Supp. 3d 941, 956 (D. Ariz. 2020) (collecting cases); *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1182 (N.D. Cal. 2007) ("[I]n the Ninth Circuit, claims of unfair competition and false advertising under state statutory and common law are 'substantially congruent' to claims made under the Lanham Act." (quoting *Cleary v. News Corp.*, 30 F.3d 1255 (9th Cir. 1994)). Therefore, the Court considers both claims together. *See 3 Ratones Ciegos v. Mucha Lucha Libre Taco Shop 1 LLC*, No CV-16-04538-PHX-DGC, 2017 WL 4284570, at *2 (D. Ariz. Sept. 27, 2017) (considering trademark claims arising under Arizona statutes in the same analysis as Lanham Act claims).

---

[4] The Court recognizes that this is a very early stage in the litigation. The information required to meet Plaintiff's burden, however, is not something that can only be revealed after extensive discovery; Plaintiff is in the best position to attest to its own practices and policies, but it has not done so outside of the bare allegation of their existence.

To prevail on a trademark infringement claim, a plaintiff "must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion, thereby infringing upon [plaintiff's] rights to the mark." *Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006). The touchstone for trademark infringement is likelihood of confusion, which asks whether a reasonably prudent consumer is "likely to be confused as to the origin of the good or service bearing one of the marks." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1214 (9th Cir. 2012). This determination is made by applying the well-established *Sleekcraft* factors: (1) strength of the mark, (2) proximity of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) types of goods and degree of care exercised by consumers, (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). This eight-factor test is "pliant"; "the relative importance of each individual factor will be case-specific." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999). "Counterfeiting is a more specialized case of trademark infringement because a counterfeit 'is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.'" *UL LLC v. Space Chariot, Inc.*, 250 F. Supp. 3d 596, 607 (C.D. Cal. 2017).

          **i.**    **Plaintiff's Ownership Interest in the Marks**

Plaintiff alleges that it owns several unregistered marks, including (1) the words "State 48 Recycling," (2) the words "'State 48 Recycling' within the State of Arizona outline," (3) the words "Industrial Recycling Solutions, Inc.," and (4) the acronym "IRSI." (Doc. 17-1 at 31.) "[O]wnership of an unregistered trademark, like ownership of a registered mark, is sufficient to establish standing under the Lanham Act." *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1226 (9th Cir. 2008); *Iancu v. Brunetti*, 139 S. Ct. 2294, 2297 (2019) ("Registration of a mark is not mandatory. The owner of an unregistered mark may still use it in commerce and enforce it against infringers.").

1  "It is axiomatic in trademark law that the standard test of ownership is priority of use." *Sengoku Works v. RMC Int'l*, 96 F.3d 1217, 1219 (9th Cir. 1996). Here, Plaintiff alleges that it used its unregistered marks for at least a year before Defendant Antifreeze Architects did so. Mr. Rich testified that Plaintiff continued to use IRSI's name and logo from approximately April 2021 to September 2021. During those months, the IRSI logo appeared on both employee uniforms and company trucks, and the logo remained on the company trucks until just last month. Plaintiff also alleges that it used the name and logo in sales and marketing of its antifreeze recycling services, including on its website.[5] (Doc. 17-1 at 10.) Plaintiff's use of the mark is therefore sufficiently public as to identify the mark in an appropriate segment of the public mind. *See Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1158 (9th Cir. 2001) (explaining that the plaintiff's totality of prior acts, taken together, can identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark). Defendants do not seem to contest that Plaintiff used the logo before Defendant Antfreeze Architects became associated with it, as alleged by Plaintiff. Defendants do contest, however, that Plaintiff is the actual owner of the "IRSI" mark. But despite any contrary assertion by Defendants or IRSI itself, the Purchase and Sale Agreement clearly states that "[Plaintiff] is purchasing all assets of the Business, including but not limited to . . . trade names and trademarks, [and] logos." (Doc. 12 at 14.) Plaintiff was also granted "use of name 'Industrial Recycling Solutions' as a 'doing business as' (DBA)" for twenty-four months "from the date of closing." (Doc. 12 at 14.) At this preliminary juncture, Plaintiff has met its burden of establishing a likelihood of success as to this element. The Court therefore concludes that Plaintiff is likely to show it has a protectible ownership in the IRSI mark..

### ii. Likelihood of Confusion

The Court next considers the *Sleekcraft* factors to determine whether Plaintiff has sufficiently shown a likelihood of success on the merits as to the likelihood of confusion.

---

[5] At the time of writing, Plaintiff's website prominently displays the "IRSI" logo, and the web address contains the "Industrial Recycling Solutions" name. *What We Do*, IRSI, http://industrialrecyclingsolutions.com/about/what-we-do/ (last visited May 23, 2022).

- 9 -

### a. Strength of the Mark

The first *Sleekcraft* factor is the strength of the mark. Normally, the "'strength' of the trademark is evaluated in terms of its conceptual strength and commercial strength." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). A mark's commercial strength, however, need not be considered at the preliminary injunction stage. *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1150 (9th Cir. 2011). A mark's conceptual strength "depends largely on the obviousness of its connection to the good or service to which it refers." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1032–33 (9th Cir. 2010). There are several categories of trademarks: arbitrary (common words with no connection to the product), fanciful (coined phrases with no known connection to the product), suggestive (does not describe the features of a product but suggests them), descriptive (defines a particular characteristic of a product in a way that does not require any exercise of the imagination), and generic (describes the product in its entirety). *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631–32 (9th Cir. 2005). Arbitrary marks, or marks whose design does not have an intrinsic connection to the products sold under the mark, should "be afforded the widest ambit of protection from infringing uses." *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 506 (9th Cir. 1991) (quoting *Sleekcraft*, 599 F.2d at 349).

The IRSI logo is likely a suggestive or descriptive mark because it offers some description of the products or services described, namely recycling services in Arizona, and is not so distinctive to rise to the level of arbitrariness. Regardless, "a suggestive or descriptive mark . . . is inherently a weak mark." *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991). Moreover, Plaintiff has provided no legal argument or caselaw to establish that this factor could weigh in any way but for in Defendants' favor. As such, this factor weighs in Defendants' favor.

### b. Relatedness of the Goods and Similarity of the Marks

"The standard for deciding whether the parties' goods or services are 'related' is

whether customers are 'likely to associate' the two product lines." *Surfvivor*, 406 F.3d at 633 (quoting *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir. 1998)). When considering the similarity of marks, courts consider the marks within the context of other identifying features and ask whether the marks are similar in sight, sound, and meaning. *Id.* Plaintiff alleges that Defendants used Plaintiff's uniforms that bore the IRSI mark to visit Plaintiff's customers to offer the same services that Plaintiff offers. (Doc. 17-1 at 101.) At least three of Plaintiff's customers confirm Plaintiff's allegations, and allege that they saw the Individual Defendants wearing the IRSI uniforms with the IRSI logo when the Individual Defendants visited them, just before Plaintiff's scheduled service. (Doc. 12 at 30–41.) These two factors weigh in Plaintiff's favor.

### c. Evidence of Confusion

"[A]ctual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act. Indeed, [p]roving actual confusion is difficult . . . and the courts have often discounted such evidence because it was unclear or insubstantial." *Network Automation*, 638 F.3d at 1151. Plaintiff has presented evidence that its customers were confused by Defendants' use of the marks, as several customers believed they were purchasing services from Plaintiff when they were actually purchasing services from Defendants. (Doc. 17-1 at 17); (Doc. 12 at 8–9.) One of Plaintiff's customers, Ms. Joanna Cook, initially believed that the Individual Defendants were still Plaintiff's employees when they arrived at her facility because "they were wearing the State 48 Recycling / IRSI uniforms and drove into [the] premises the way that [Plaintiff's] employees did for servicing us." (Doc. 12 at 35.) Another customer, Mr. James Strang, believed the Individual Defendants "were employees of [Plaintiff]" when they arrived at his facility because "[t]hey were wearing the State 48 Recycling / IRSI uniforms, and they held themselves out to . . . as [Plaintiff's] employees during the conversation." (Doc. 12 at 39-40.) And another customer, Ms. Heather Hanson, stated that she believed the Individual Defendants were Plaintiff's employees when they arrived at her facility because "[t]hey were wearing State 48 Recycling/ IRSI uniforms." (Doc. 12 at 31.) Although Defendants

dispute that they held themselves out as Plaintiff's employees, it is clear from these witnesses that they believed the Individual Defendants were Plaintiff's employees because the uniforms were the same and bore the IRSI logo. This factor weighs in Plaintiff's favor.

### d. Marketing Channels Used

In analyzing this factor, courts look to whether the parties "distribute their goods in the same marketing channels." *Surfvivor*, 406 F.3d at 633. Plaintiff's advertising mainly consists of its website, uniforms, invoices, and company trucks. Defendants, on the other hand, used business cards, invoices, and hats. Although these channels have some overlap, it is not substantial. What is more instructive, however, is that the Individual Defendants directly advertised to Plaintiff's customers, sometimes even specifically referencing Plaintiff. Ms. Hanson stated that the Individual Defendants represented to her that they were "going around to their old company contacts" to "earn [their] business." (Doc. 12 at 31.) Ms. Cook likewise stated that the Individual Defendants told her that they had started their own business and "offered the 'same quality products as others, but cheaper.'" (Doc. 12 at 35.) And Mr. Strang recalled that the Individual Defendants asked him if they could fill up the coolant tanks. (Doc. 12 at 40.) It is hard to imagine marketing channels that are more "convergent," and thus more likely to increase the likelihood of confusion, than directly soliciting Plaintiff's customers while wearing uniforms bearing Plaintiff's logo. *Sleekcraft*, 599 F.2d at 353. This factor weighs in favor of Plaintiff.

### e. Degree of Purchaser Care

"In analyzing the degree of care that a consumer might exercise in purchasing the parties' goods, the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." *Surfvivor*, 406 F.3d at 634 (citing *Brookfield Commc'ns., Inc.*, 174 F.3d at 1060). The "reasonably prudent consumer" is expected "to be more discerning—and less easily confused—when he is purchasing expensive items." *Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1037 (N.D. Cal. 2017), *aff'd*, 786 F. App'x 662 (9th Cir. 2019) (quoting *Brookfield Commc'ns, Inc.*, 174 F.3d at 1060). "Generally, consumers are expected to proceed with more care if

the goods or services are specialized or of uncommon importance"; however, consumers will exercise less care when making "impulsive purchasing decisions." *Great Am. Duck Races Inc. v. Kangaroo Mfg. Inc.*, 398 F. Supp. 3d 494, 506 (D. Ariz. 2019).

Although the Court has been presented with little evidence as to what either party charges for its products, Plaintiff has asserted—and Defendants do not seem to contest—that Plaintiff produces "a proprietary blend of coolant with a unique chemical make-up." (Doc. 12 at 11.) Plaintiff's product comes with a warranty that can be voided by misuse, such as by "[Defendant] Antifreeze Architects, LLC servicing the customers' coolant tanks containing [Plaintiff's] coolant, or servicing [Plaintiff's] coolant tanks located on its customers' premises." (Doc. 12 at 11.) It can be reasonably inferred, therefore, that Plaintiff's customer would "proceed with more care" because of the specialized nature of the product. *Great Am. Duck*, 398 F. Supp. 3d at 506. Ms. Cook's declaration corroborates this inference because she states that "[c]oolant color is highly significant and allows for businesses to identify the type of coolant and the chemical make-up of that coolant" and that "vehicles have specific coolant specifications," and "[i]nstalling altered coolant or some other liquid into . . . vehicles could cause significant damage."[6] (Doc. 12 at 36.) She further states that based on her years in the industry, she "can identify by visual inspection automotive coolant that has gone bad or that has been altered" by reviewing factors like the "[l]iquid consistency, color, smell, [or the presence of] visible debris." (Doc. 12 at 35.) Plaintiff's customers, therefore, can be expected to exercise a high degree of care when purchasing coolant because it is a specialized product; however, that determination does not end the analysis.

Even given the high degree of a care Plaintiff's customers would be expected to exercise, all three of Plaintiff's customers who submitted declarations stated that they initially believed that the Individual Defendants continued to work for Plaintiff because they wore the IRSI uniforms, "drove into [the] premises the way that [Plaintiff] did," and

---

[6] Ms. Cook also alleged that she bought $400 worth of product from Defendants, but without evidence of how much product she received for this payment, the Court cannot discern how the price would weigh in this analysis. (Doc. 12 at 35.)

- 13 -

"held themselves out . . . as [Plaintiff's] employees during the conversation." (Doc. 12 at 31, 35, 39–40.) Given that the IRSI logo is alleged to have been present on the uniforms, the Court finds it completely reasonable that even a highly prudent customer would have no reason to assume that the Individual Defendants were not Plaintiff's employees. *Daimler AG v. A-Z Wheels LLC*, 334 F. Supp. 3d 1087, 1097 (S.D. Cal. 2018) (noting that even where consumers would exercise a high degree of care, the degree of care factor would not weigh against the plaintiff because nothing would have alerted consumers that they were purchasing a replica version of the product); *UL LLC*, 250 F. Supp. 3d at 611 (same); *Adobe Sys., Inc. v. Dafang USA, LLC*, No. 218CV08504VAPAGRX, 2019 WL 7841862, at *4 (C.D. Cal. Aug. 22, 2019) ("[E]ven if customers are 'reasonably prudent' in purchasing such expensive products[,] . . . there is likelihood of confusion because Defendants' unauthorized copies are identical counterfeits."). The Court does note that although all three customers were eventually alerted to the truth, only one did so based on the circumstances—the Individual Defendants' early arrival and different truck. (Doc. 12 at 40.) The others became aware only after the Individual Defendants stated they were "going around to their old company contacts" or "going [out on] their own." (Doc. 12 at 31, 34.) Though this factor does not weigh as strongly as the others in Plaintiff's favor, it does weigh in Plaintiff's favor.

### f. Defendants' Intent

"While 'an intent to confuse consumers is not required for a finding of trademark infringement,' *Brookfield [Commc'ns, Inc.]*, 174 F.3d at 1059, 'intent to deceive is strong evidence of a likelihood of confusion.'" *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1148 (9th Cir. 2002) (quoting *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 184 F.3d 1107, 1111 (9th Cir.1999)). "When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Id.* (quoting *Sleekcraft*, 599 F.2d at 354 (citations omitted)).

Defendants deny that they have made any misrepresentations or have held

themselves out as Plaintiff's employees when they were not. (Doc. 13 at 10.) They also deny that they ever serviced Plaintiff's customers wearing uniforms that bore the IRSI logo. But Plaintiff's three customers contradict this assertion, with one customer stating that the Individual Defendants "held themselves out" as Plaintiff's employees during his conversation with them. (Doc. 12 at 40.) The Court will credit the disinterested customers' testimony that the Individual Defendants were wearing the IRSI uniform and logo; however, given the very preliminary stage of this case, the Court will not weigh this factor as strongly against Defendants as it likely would at a later stage. *eAcceleration Corp. v. Trend Micro, Inc.*, 408 F. Supp. 2d 1110, 1117 (W.D. Wash. 2006) ("The intent factor, if present, will weigh heavily in favor of finding a likelihood of confusion but, if absent, will generally have no effect."). This factor weighs in Plaintiff's favor.

### g. Likelihood of Expansion

This final factor is granted minimal legal significance when a plaintiff has already established that the parties offer overlapping goods or services. *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 436 (9th Cir. 2017). As Plaintiff has shown both parties offer the same goods and services, this factor is not instructive.

### h. Conclusion

On balance, the Court concludes that the majority of the *Sleekcraft* factors favor Plaintiff. Specifically, the relatedness of the goods, the similarity of the marks, the evidence of actual confusion, and the marketing channels used weigh strongest in Plaintiff's favor at this preliminary stage. The degree of consumer care and Defendants' intent also weigh in Plaintiff's favor, but less than the other factors. The strength of the mark weighs squarely in Defendants' favor. Given that a clear majority of factors favor Plaintiff, Plaintiff has established that it is likely to succeed on its trademark infringement claim.

### 4. Defamation

"One who publishes a false and defamatory communication concerning a private person . . . is subject to liability, if, but only if, he (a) knows that the statement is false and

it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them." *Reynolds v. Reynolds*, 231 Ariz. 313, 317, 294 P.3d 151, 155 (Ct. App. 2013) (quoting *Dube v. Likins*, 216 Ariz. 406, 417, 167 P.3d 93, 104 (Ct. App. 2007)). "To establish defamation under Arizona common law, 'a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation.'" *Rogers v. Mroz*, 502 P.3d 986, 988 (2022) (quoting *Godbehere v. Phx. Newspapers, Inc.*, 162 Ariz. 335, 341, 783 P.2d 781, 787 (1989)).

Plaintiff has not addressed how Defendants' alleged single statement that Plaintiff was no longer in business makes a "clear showing" of likelihood of success on the merits.[7] *Winter v. Nat'l Res.*, 555 U.S. at 376. Even assuming that this lone comment actually "impeach[es] plaintiff's . . . reputation" and amounts to defamation, neither party has addressed the presumptive unconstitutionality of prior restraints on speech, and the "heavy burden of justification" required to issue preliminary relief without an adjudication on the merits. *Oakley, Inc. v. McWilliams*, 879 F. Supp. 2d 1087, 1089 (C.D. Cal. 2012); *List Indus., Inc. v. List*, No. 217CV2159JCMCWH, 2017 WL 3749593, at *3 (D. Nev. Aug. 30, 2017) ("The problem of prior restraints is multiplied when a court issues one before a proper trial on the merits."); *Bobolas v. Does 1-100*, No. CV–10–2056–PHX–DGC, 2010 WL 3923880, at *6 (D. Ariz. Oct. 1, 2010) (denying the plaintiff's TRO application and noting that "[p]rior restraints may be issued only in rare and extraordinary circumstances"). Regardless of these concerns, however, the Court did explore with defense counsel whether Defendants would be amenable, at least for the time being, to refrain from making misstatements about Plaintiff. Defense counsel indicated that because Defendants have not made and are not making misstatements, he would "welcome" this solution, which would alleviate some of Plaintiff's concerns and potentially deter costly litigation. *See also*

---

[7] Plaintiff's only support that this comment was actually made is a handwritten note on an invoice for Cottonwood Express Lube. (Doc. 12 at 46.) Aside from any hearsay concerns, this lone note is insufficient to create a "clear showing" of likelihood of success on the merits. To the extent that Plaintiff argues that the Individual Defendants actually made verbal statements representing that they were Plaintiff's employees, the Court has been presented with no evidence of these specific statements.

- 16 -

(Doc. 13 at 11.) The Court will thus order appropriate relief. *See Desert Palm Surgical Grp., P.L.C. v. Petta*, 236 Ariz. 568, 575, 343 P.3d 438, 445 (Ct. App. 2015) (noting that superior court entered TRO enjoining defendant from making false statements after defense counsel stipulated to the relief requested).

### B. Irreparable Harm

"An irreparable harm is one that cannot be redressed by a legal or equitable remedy following trial." *Optinrealbig.com. LLC v. Ironport Sys.*, 323 F. Supp. 2d 1037, 1051 (N.D. Cal. 2004). Mere financial injury does not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation. *Sampson v. Murray*, 415 U.S. 61, 90 (1974). The Ninth Circuit, however, has "recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). Irreparable injury is likely in the absence of an injunction where damage to a plaintiff's goodwill is likely. *See Am. Trucking Assoc., Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009) ("[L]oss of goodwill and reputation" supports injunctive relief); *Herb Reed Enters.*, 736 F.3d at 1250 ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm.").

The Court has found that Plaintiff is likely to succeed on its trademark infringement claim. Defendants' use of the IRSI mark could continue to confuse consumers and diminish the distinctiveness of Plaintiff's brand, thereby preventing Plaintiff from controlling its reputation. Plaintiff presented testimony that although IRSI is an older company, Plaintiff has been thorough in both distinguishing itself while also maintaining the goodwill of the IRSI name. Plaintiff carefully phased out the IRSI logo and gradually replaced it with its own. As a result, although Plaintiff's customers know they do business with Plaintiff, they also associate the IRSI name with Plaintiff. (Doc. 12 at 30, 34, 39.) Moreover, in at least one instance, Defendants' product had to be evacuated because a customer was dissatisfied with its quality. (Doc. 12 at 34–37.) Because Plaintiff has already established a likelihood of success as to confusion, it is reasonable that any

customer dissatisfied with Defendants' services may erroneously associate that experience with Plaintiff because of the IRSI mark. This concern is further complicated by the fact that by using Defendants' products, customers may unknowingly void Plaintiff's warranty for its own product. Such confusion would harm both the customer, who directly benefits from the warranty, and Plaintiff itself, who will no longer be able to market its product to its existing customers in the same way, or even for the same price, without the warranty. Plaintiff has adequately shown irreparable harm.

### C. Balance of Equities

"The balance of equities factor 'requires the court to "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief."'" *Traeger Pellet Grills, LLC v. Dansons US, LLC*, 421 F. Supp. 3d 876, 889 (D. Ariz. 2019) (quoting *Mendoza v. Garrett*, 358 F. Supp. 3d 1145, 1181 (D. Or. 2018)). As explained above, Plaintiff has established irreparable harm if Defendants' activities continue. Defendants, on the other hand, point to no specific hardship other than their invested savings. (Doc. 13 at 11.) The Court's relief on this issue is narrow; it does not bar Defendants from soliciting customers, or even soliciting Plaintiff's customers. Instead, Defendants must simply refrain from using the IRSI mark and from holding themselves out as Plaintiff's employees. Given the irreparable harm to Plaintiff if Defendants are not enjoined, in comparison to the relatively little effect on Defendants, the Court finds this factor to weigh in Plaintiff's favor.

### D. Public Interest

"The public interest in preventing trademark infringement is avoiding confusion in the marketplace." *Seed Servs., Inc. v. Winsor Grain, Inc.*, 868 F. Supp. 2d 998, 1005 (E.D. Cal. 2012). "When a trademark is said to have been infringed, what is actually infringed is the right of the public to be free of confusion and the synonymous right of the trademark owner to control his products' reputation." *CytoSport Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009). Although the Court recognizes that there may be a public interest against restraints of trade, the Court does not believe the remedy here will

result in any such restraint. Plaintiff has successfully shown that there is a likelihood of consumer confusion if the Individual Defendants continue to service Plaintiff's customers wearing a logo associated with Plaintiff. To remedy that confusion, Defendants are not restricted from soliciting customers or otherwise competing in the marketplace; they just cannot do so while wearing the IRSI logo and holding themselves out as Plaintiff's employees. The TRO is narrowly designed only to prevent consumer confusion, which is clearly in the public interest. This factor weighs in Plaintiff's favor.

### E. Security

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Although the plain language of the rule suggests that a bond is mandatory, the Ninth Circuit has held that it "invests the district court 'with discretion as to the amount of security required, *if any*.'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)).

In the present case, Plaintiff suggests a bond of $2,000. (Doc. 17-1 at 105.) Because Defendants deny that they are doing anything the Court will enjoin them from doing, however, the Court does not find any bond necessary.

### CONCLUSION

Plaintiff has met its burden for obtaining a temporary restraining order. It has shown that it is likely to succeed on its claim for trademark infringement. It has also shown that it will suffer immediate and irreparable harm if a TRO is not issued, that the balance of equities tips in its favor, and that a TRO is in the public interest. Defendants have also agreed to be enjoined from making false statements about Plaintiff.

**IT IS THEREFORE ORDERED** that Plaintiff's Application for and Memorandum in Support of Temporary Restraining Order and Preliminary Injunction (Doc. 17-1 at 86.) is **GRANTED IN PART AND DENIED IN PART.** The TRO is issued as to Plaintiff's trademark infringement and defamation claims but denied on all other

grounds.

**IT IS FURTHER ORDERED** that for twenty-eight days from the date of this Order, Defendants are temporarily enjoined as follows:

1. Defendants Janes and Alva are enjoined from holding themselves out as employees of Plaintiff.
2. Defendants are enjoined from intentionally or knowingly publishing false statements about Plaintiff to any third party.
3. Defendants Janes and Alva are enjoined from using Plaintiff's uniforms bearing the IRSI mark to solicit business from Plaintiff's customers.

**IT IS FURTHER ORDERED** that within 5 days of this Order, the parties shall submit to the Court a Joint Report containing the positions of the parties regarding expedited discovery, the consideration of a Preliminary Injunction or length of this Temporary Restraining Order, and any other procedural matters the parties request the Court to address.

Dated this 26th day of May, 2022.

G. Murray Snow
Chief United States District Judge